**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal No. 20-145 (ECT/BRT)**

---

United States of America,

            Plaintiff,

vs.

Seth Grant Huntington,

            Defendant.

**DEFENDANT'S POSITION**
**WITH RESPECT TO SENTENCING**
**AND REQUEST FOR VARIANCE**

---

    This memorandum is submitted on behalf of Defendant Seth Grant Huntington in connection with his sentencing before the Honorable Eric C. Tostrud. The memorandum will first address the applicable statutory sentencing range and the proper guideline calculations. Then the memorandum will articulate and outline the basis for Mr. Huntington's request for a downward variance from the advisory sentencing guideline range and why such a sentence is consistent with the provisions of 18 U.S.C. § 3553(a).

    Mr. Huntington objects to the determination that he is subject to an enhanced sentence under the Armed Career Criminal Act (ACCA), 18 U.S.C. §924(e). Accordingly, Mr. Huntington will be requesting a sentence less than the advisory guideline range calculated by the PSR because a variance is appropriate based on 18 U.S.C. §3553 (a) factors and his own unique circumstances.

**ACCA: Force Clause Predicates**

Mr. Huntington objects to the determination that he is an armed career criminal and subject to an enhanced sentence under the provisions of the ACCA. His first objection is to the definition of "assault" under Minnesota law, which applies to two convictions for third-degree assault and his conviction for first-degree burglary with assault. His second objection is to the overbreadth of the Minnesota definition of "methamphetamine," although admittedly that objection would only be meaningful if the Court were to deem his other convictions not to be predicates.

The Armed Career Criminal Act severely punishes those who are convicted of possessing firearms after having previously committed three or more predicate offenses, which can be either violent felonies or serious drug offenses. A "violent felony" is defined as a crime punishable by more than a year in prison that, as relevant to the matter here, "has as an element the use, attempted use, or threatened use of physical force against the person of another" (the ACCA's "force" or "elements" clause). 18 U.S.C. § 924(e)(2)(B).

Under existing Eighth Circuit precedent, all Minnesota assaults are predicate violent felonies under the ACCA's force clause. *See*, *e.g.*, *United States v. Wadena*, 895 F.3d 1075, 1076 (8th Cir. 2018) (discussing the definition of "assault" in Minn. Stat. § 609.02, subd. 10). Likewise, although Minnesota's burglary statutes are too broad to fall under the enumerated-offense clause, *see United States v. Bugh*, 459 F.Supp.3d 1184, 1194 (D. Minn. 2020), Mr. Huntington's specific burglary conviction has assault as a required element, so it has been deemed a violent felony under the force clause. *See*

2

*United States v. Bennett*, Crim.No. 12-144 (ADM), Memo. Opinion and Order (D.Minn. July 26, 2018).

Current Eighth Circuit precedent approving assault as a valid force-clause predicate rests on two errors. First, the precedents rely on Supreme Court precedents analyzing a statute other than the ACCA, in a manner similar to that ruled erroneous in *Borden v. United States*, 141 S. Ct. 1817 (June 10, 2021). Second, the precedents do not reckon with Minnesota caselaw elaborating on the limited mens rea requirement for assault. Because Minnesota has interpreted its assault statute to require only common-law battery, neither third-degree assault nor first-degree burglary with assault may be valid predicates.

To decide whether an offense satisfies the force clause, courts employ the categorical approach, which ignores the particular facts of a particular defendant's case to focus instead on the statutory elements a jury must necessarily find to convict. *See*, *e.g.*, *Borden*, Slip Op. at 5. In this analysis, a reviewing court "must presume that the convictions rested upon nothing more than the least of the acts criminalized" by the statute. *Moncrieffe v. Holder*, 569 U.S. 184, 190–91 (2013) (quoting *Johnson v. United States*, 559 U.S. 133, 137 (2010)) (cleaned up). If "the least of the acts criminalized" by a state's law do not meet the requirements of the force clause, then that state offense is overbroad and cannot be a violent felony under the ACCA. *See Borden*, Slip Op. at 5–6.

*Johnson* (2010) elaborated on the meaning of "physical force" in the force clause. The Court noted that force was an element of common-law battery, which required "the intentional application of unlawful force against the person of another," and where the force necessary was "the slightest offensive touching." *See Johnson*, 559 U.S. at 139

3

(citing in support Blackstone, among others. But because they were interpreting "force" in the context of defining a "violent felony," the Court ruled that a greater degree of force was necessary. *See id*. at 139–40. The force required under the ACCA was "force capable of causing physical pain or injury to another person." *Id*. at 140.

With that background, we now turn to Minnesota law. Minnesota defines "assault" as "(1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10. There are therefore two means of committing an assault, which Minnesota courts have termed "assault-fear" and "assault-harm." *See State v. Fleck*, 810 N.W.2d 203, 305 (Minn. 2012). Juries need not be unanimous about whether a defendant has committed assault-fear or assault-harm, so the definition is indivisible. *See State v. Dalbec*, 789 N.W.2d 508, 513 (Minn. Ct. App. 2010) ("The jury could agree, therefore, that appellant intended to assault S.M., but need not agree on whether the assault was accomplished by causing fear or inflicting or attempting to inflict bodily harm.").

On its face, the definition of "assault" under Minnesota law establishes a clear ACCA predicate under the force clause, but the Minnesota appellate courts have interpreted the definition in unexpected ways that take assault-harm out of the ACCA's reach. And the Supreme Court tells us that it is the state courts who are the final arbiters of the meaning of state statutes. *See Johnson*, 559 U.S. at 138 ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements[.]"). Minnesota distinguishes between the intent necessary to commit

4

assault-fear and assault-harm.[1] *See Fleck*, 810 N.W.2d at 309–10. The Minnesota Supreme Court has determined that assault-harm requires only the general intent to "intentionally engage[] in the prohibited conduct," and "nothing in the definition requires proof that the defendant meant to violate the law or cause a particular result." *Id*. The only intent required for assault-harm is the "intent to do the prohibited physical act of committing a battery." *Id*. at 310.

The Minnesota Supreme Court later clarified that the intent necessary for assault requires only that a defendant "intentionally apply force to another person without his consent." *State v. Dorn*, 887 N.W.2d 826, 831 (Minn. 2016). With that definition, *Dorn* approved a conviction for first-degree assault where the evidence showed that the defendant merely pushed the victim, which led him to trip and fall into a fire. *See id*. at 833. *Dorn* emphasized that, after *Fleck*, the common-law definition of battery, requiring only "the slightest offensive touching," defined Minnesota assault. *See id*. at 832 (citing *Gallagher v. State*, 3 Minn. 270, 271–73, 3 Gil. 185, 187–88 (1859), for the proposition that a strike hard enough to make a person lose his balance was properly considered a battery).

Existing Eighth Circuit precedents tells us that Minnesota's definition of assault is a valid force-clause predicate for the ACCA, but *Borden* shows how those precedents rest on a faulty premise. Like *United States v. Fogg*, 836 F.3d 951 (8th Cir. 2016) (approving

---

[1] Some Minnesota appellate court decisions have noted how language in *Fleck* (suggesting that assault-fear and assault-harm might be considered different offenses) creates a tension with *Dalbec*'s holding (that assault-fear and assault-harm are different means of committing assault), but at least for now *Dalbec* remains good law. *See*, *e.g.*, *State v. Larkins*, A20-1006, Slip Op. at 1 n.4 (Minn. Ct. App. Aug. 23, 2021) ("We have not yet decided whether *Fleck* abrogated *Dalbec* by implication, and we need not decide the question here.")

reckless crimes as ACCA predicates in reliance on the definition of force in *Voisine v. United States*, 136 S. Ct. 2272 (2016), another case involving not the ACCA but the "misdemeanor crime of domestic violence"), *overruled by Borden*, the decisions analyzing Minnesota assault do so under the mistaken belief that decisions like *United States v. Castleman*, 572 U.S. 157 (2014), addressing the force necessary to establish a misdemeanor crime of domestic violence under 18 U.S.C. § 922(g)(9), should guide ACCA analysis, despite the different language and different purposes of the two statutes.

This dispute between the definitions of force in *Johnson* (2010) and *Castleman* was made explicit in *United States v. Rice*, 813 F.3d 704 (8th Cir. 2016), where the panel analyzed an Arkansas statute criminalizing intentionally or knowingly causing bodily injury to another as a crime of violence under §§ 2K2.1 and 4B1.2 of the sentencing guidelines. The majority compared the Arkansas statute to the Tennessee statute at issue in *Castleman* and found them to be a match, so it affirmed the use of his conviction as a crime of violence. *See id*. at 705–06.

The dissent pointed out that this was a misrepresentation of *Castleman*'s more limited holding. For its analysis of the "misdemeanor crime of domestic violence" statute, *Castleman* explicitly adopted the common-law definition of force, the same definition explicitly rejected for ACCA analysis in *Johnson* (2010). *See id*. at 706 (Kelly, J., dissenting). The majority quoted Justice Scalia's concurrence for the proposition bodily injury implied not just common-law force but the "strong violent force" required by *Johnson* (2010). *See id*. at 706 (quoting *Castleman*, 134 S.Ct. at 1416–17 (Scalia, J., concurring)). But as the dissent pointed out, the *Castleman* majority specifically said that

6

the application to the ACCA was not at issue. *See id*. at 707 (quoting *Castleman*, 134 S.Ct. at 1414).

But the dissent's interpretation of *Castleman* did not carry the day, and Minnesota's second-degree assault statute was subsequently deemed a force-clause predicate in reliance on *Castleman* and *Rice*. *See United States v. Lindsey*, 827 F.3d 733, 739–40 (8th Cir. 2016). And because the core definition of assault under Minnesota law is the same for all degrees, the Eighth Circuit has applied the same analysis to third-degree assault. *See Wadena*, 895 F.3d at 1076 ("Although *Lindsey* concerned second-degree assault and this case concerns third-degree assault, the definition of 'assault'—derived from Minn. Stat. § 609.02, subdiv. 10—is the exact same for each. As such, *Lindsey* controls.").

Simply stated, Mr. Huntington's argument is that Minnesota's definition of assault does not require the necessary quantum of force under *Johnson* (2010) because it can be committed through simple battery, and so his conviction for first-degree burglary with assault and his two convictions for third-degree assault are not proper ACCA predicates under the force clause.[2] The Eighth Circuit precedents holding to the contrary rely almost exclusively on the lesser definition of force employed in *Voisine* and *Castleman*, a reliance that in a similar manner led to the erroneous result in *Fogg*.

While *Borden* chips away the foundation beneath it, *Lindsey* remains good law. But the Eighth Circuit has not had opportunity to address the implications of *Fleck* and

---

[2] The Supreme Court has explicitly left open the question of whether causing bodily injury is itself proof of violent force. *See Castleman*, 572 U.S. at 167 ("Whether or not the causation of bodily injury necessarily entails violent force—a question we do not reach—mere offensive touching does not.") (distinguishing *Johnson* (2010)).

7

*Dorn* to the analysis of whether assault may be a proper force-clause predicate. Mr. Huntington objects that his convictions for first-degree burglary and third-degree assault are improper predicates, and he respectfully asks the Court not to sentence him under the ACCA.

**ACCA: Serious Drug Offense Predicate**

Mr. Huntington further objects to the use of his conviction for possession of methamphetamine precursors with intent to distribute as a "serious drug offense" under the ACCA, relying on *United States v. Oliver*, --- F.3d ---, No. 19-2209 (8th Cir. Feb. 11, 2021) (vacating an enhanced mandatory sentence under 21 U.S.C. §§ 841 and 851 because, as held by the Seventh Circuit and endorsed by the Eighth Circuit, Illinois drug laws are categorically overbroad in defining cocaine). Mr. Huntington's offense came under Minn. Stat. § 152.0262, subd. 1(a) (2014), which establishes that a person commits the crime "if the person possesses any chemical reagents or precursors with the intent to manufacture methamphetamine." Because the definition of methamphetamine in Minnesota is overbroad, he objects to it being used as an ACCA predicate.

A "serious drug offense" under the ACCA is either a federal offense or "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))" punishable by ten or more years in prison. 18 U.S.C. § 924(e)(2)(A). In determining whether a prior drug offense qualifies as a predicate offense for sentencing enhancement, the proper analysis uses a categorical approach that looks only to the statutory definition of the prior offense. *See Oliver*, Slip Op. at 15–16 (citations omitted). "If the state offense sweeps more broadly, or punishes

more conduct than the federal definition, the conviction does not qualify as a predicate offense." *Id*. at 16 (quoting *United States v. Vanoy*, 957 F.3d 865, 867 (8th Cir. 2020)).

As will be explained in more detail below, Minnesota drug laws punish more isomers of methamphetamine than federal drug law, which makes them overbroad. "Isomers" are two or more molecules that are identical in chemical formula, but which differ in their structure and arrangement. *See*, *e.g.*, Ernest L. Eliel, et al., Stereochemistry of Organic Compounds 1021 (1994). Minnesota definitions of these substances include all possible isomers, while the federal definition is limited to the optical isomer of methamphetamine.

Methamphetamine's federal definition is narrow. Methamphetamine is defined under federal law as "any quantity of methamphetamine, including its salts, isomers, and salts of isomers." 21 U.S.C. § 812, Schedules II(c) and III(a)(3). Although this sounds on its face identical to the Minnesota definition, federal law has a specific definition of "isomer" that differs for the different drug schedules. For schedules II(c) and III(a)(3), where methamphetamine appears, "isomer" means ***only*** "the optical isomer." 21 U.S.C. § 802(14); *see United States v. De La Torre*, 940 F.3d 938, 951 (7th Cir. 2019) (analyzing 21 U.S.C. § 802(14) and concluding that, "for purposes of federal drug offenses, methamphetamine includes only its optical isomers," before ruling overbroad the Illinois statute under which the defendant was convicted).

The Minnesota legislature knew how to limit the definitional isomers when it wished, demonstrating that it was a conscious choice to leave the definition of methamphetamine as broad as possible. The Minnesota legislature limits the definition of amphetamine, for example, to just its "optical isomers." *See* Minn. Stat. § 152.02, subd.

9

3(d)(1). And the "usual rule" of statutory construction suggests that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004).

Counsel is raising this matter in another case where ACCA sentencing is dependent upon methamphetamine sale convictions, but that matter has not been resolved and as far as he is aware it has not been directly addressed by any other district court. In the Seventh Circuit, though, it has led to several resentencings in the Seventh Circuit, and in *Oliver* the Eighth Circuit accepted the logic of those decisions. The logic of those Seventh Circuit decisions applies as well to Minnesota's drug laws.

The first of these decisions ruled that an Indiana drug conviction could not be used as a predicate "felony drug offense" to enhance a federal mandatory-minimum sentence under 21 U.S.C. §§ 841 and 851 because of the included isomers of methamphetamine. *See United States v. De La Torre*, 940 F.3d 938, 951–52 (7th Cir. 2019). Unlike the federal definition of methamphetamine, which includes only optical isomers, the Indiana law punishes all "isomers" without qualification, using the same language as Minnesota. *See id*. at 951 (quoting Ind. Code § 35-48-2-6(d)(2), which lists "methamphetamine, including its salts, isomers, and salts of its isomers"). "Because the federal definition of methamphetamine includes only its optical isomers whereas the Indiana definition includes something more than just optical isomers of methamphetamine, the mismatch renders the Indiana statute overbroad." *Id*.

The following year, in *Ruth*, the Seventh Circuit came to a similar conclusion regarding the isomers of cocaine punished in Illinois, finding plain error where the

appellant's sentence was enhanced under 21 U.S.C. §§ 841 and 851. *See* 966 F.3d at 650–51. The federal definition of cocaine, *Ruth* noted, is limited to "optical and geometric" isomers, while Illinois also includes positional isomers. *See id.* at 647 (comparing 21 U.S.C. §§ 812, Sched. II(a)(4) and 802(14) with 720 ILCS 570/206(b)(4)). Because of this mismatch, "on its face . . . the Illinois statute is categorically broader than the federal definition." *Id*. In finding plain error and vacating the appellant's sentence, the Seventh Circuit rejected as irrelevant a research chemist's affidavit swearing that he had never encountered positional isomers in analyzing over 50,000 cocaine samples during his tenure at the DEA. *See id.* at 648. "We must," wrote the Seventh Circuit, "give effect to the law as written."

Although the Seventh Circuit has not adopted this argument specifically in terms of the ACCA, the implications are clear. In *United States v. Nebinger*, --- F.3d ---, No. 19-1504, Slip Op. at 12–13 (7th Cir. Feb. 11, 2021), they rejected a *Ruth* challenge to Illinois drug convictions used as ACCA predicates not because it failed on the merits, but because those arguments were forfeited where "Ruth made the same argument that . . . Nebinger could have made" but didn't. At least one district court has followed *Ruth* in vacating an ACCA sentence that had been based on an Indiana drug predicate. *See Alston v. United States*, No. 2:16-cv-00016-JMS-DLP (S.D. Ind. Jan. 11, 2021) (granting a § 2255 motion where Indiana's law was overbroad in how it punished isomers of cocaine).

The Eighth Circuit has now accepted the logic of these decisions. In *Oliver*, the panel addressed an appellant whose mandatory-minimum sentence was enhanced based on an Illinois drug conviction. "Applying the categorical approach," the panel wrote, "we

see that 720 Ill. Comp. Stat. 570/401 is broader than the federal definition of a 'serious drug felony.'" *Oliver*, Slip Op. at 17 (citing *Ruth*, 966 F.3d at 645–47). Because there was some question about whether Mr. Oliver had been convicted under the part of the divisible statute dealing with cocaine, his enhanced sentence was vacated and the matter remanded for resentencing because of the overbreadth of the Illinois statute. *See id*., Slip Op. at 19.

Here, the overbreadth is clear. Minnesota punishes all isomers of methamphetamine, while federal law is limited to just optical isomers. Because of the clear facial overbreadth of Minnesota's definition of methamphetamine, his conviction for possession of precursors is not a valid ACCA predicate. He respectfully asks the Court to find that this conviction does not count as a "serious drug offense" under the ACCA.

**Guideline Calculation**

If Mr. Huntington is determined to be ACCA-eligible, the total offense level would be 30 and a criminal history category of VI. Because of the ACCA status, the guideline imprisonment range is 180–210 months. Absent determination that Mr. Huntington is subject to an ACCA enhancement, the offense level would be 24, reduced by 3-levels for acceptance of responsibility to 21. Accordingly, with a criminal history VI and offense level of 21, Mr. Huntington would be subject to a potential imprisonment range of 77–96 months.

**Personal Background**

First and foremost, Mr. Huntington is an addict. He's been one for quite some time. As made abundantly clear in the PSR, Mr. Huntington is a productive and contributing member of society—when he is sober. But when he is using, he is not. His drug use has been the primary catalyst for his criminal activity. His life has been a rollercoaster between two extremes, as confirmed in the letters of support submitted by his parents, the mother of his children, and his close personal friends.

Mr. Huntington has responded well to treatment in the past and, given the opportunity, he will do so again. Mr. Huntington opted to accept responsibility for his actions and plead guilty, despite knowing he faced a significant potential sentence under the ACCA.

At the time of his arrest, Mr. Huntington was experiencing severe depression. The primary reason he possessed a firearm was not to perpetuate violence against others, but because his thoughts had gotten so dark that he seriously considered ending his own life. The details of his tragic situation at the time of his arrest are set forth in painful and graphic terms in his own letter to the Court that has been filed separately. As he tells the Court, his only objective in possessing a firearm was to harm himself. His mental status at the time of the offense was confirmed by his neighbor, who actually reported his concerns to the police, which led to Mr. Huntington's arrest.

Mr. Huntington now stands before the Court convicted of a serious crime and is facing serious time. Nobody knows that better than he does. Mr. Huntington wants the Court to know that he has accepted responsibility and is prepared to accept the

consequences of his actions. But he also wants the Court to be aware of his upbringing and the impact it has had on his life.

Mr. Huntington was a child of divorce, and his mother heavily abused drugs and alcohol during his childhood and eventually ended up incarcerated. His mother candidly admits in her letter to the Court how terrible she feels about the events Mr. Huntington had to experience as a result of her drug abuse and time away from him in prison. Although his father as a single parent was able to provide for the children, it was in a strict and controlling environment.

**Mental and Emotional Health**

Likely as a result of the trauma of the divorce and the lack of a caring, stable mother, Mr. Huntington has been suffering from anxiety and depression throughout his life.  He has undergone numerous psychological assessments and more than likely his drug use has been a form of self-medication to deal with these issues.

Mr. Huntington was a patient at the Olmstead Medical Clinic for several years beginning in 2015. In the course of that treatment, they documented his past medical history as follows:

1. Neurological disorder TBI-back of head, Car Accident
2. Injuries/accidents burns on both legs
3. Skin disorder Tinea Versicolor
4. Depression
5. Generalized anxiety disorder
6. Organic insomnia
7. Personality disorder
8. Substance use disorders

Remarkably, this lengthy list fails to include his other important diagnosis of attention deficit disorder. Mr. Huntington was placed on several medications in an attempt to reduce the symptoms of his numerous conditions. Mr. Huntington also sought and

14

received treatment and counseling with Jeffrey Clark Counseling in Rochester, Minnesota.

Mr. Huntington has always tried to get appropriate medical and mental health treatment for his various conditions. That treatment continued through January 3, 2020. In the course of treatment, Mr. Huntington made significant progress and developed control of the behaviors that have led him to several past negative and criminal incidents. Mr. Huntington has participated in various treatment programs including a lengthy program at Minnesota and Adult Teen Challenge. He also had received psychiatric treatment through Olmstead Medical Center.

Despite the many starts and stops throughout his youth and adult life, Mr. Huntington has a sincere desire to continue to receive mental health and substance abuse treatment in the future. Methamphetamine is a very potent and addictive substance, and he would like to put it behind him once and for all. Notwithstanding his past and the prospect of a lengthy prison sentence, Mr. Huntington is still sincere about wanting to change and improve himself as an individual and a father to his children.

Although plagued by both mental health and addiction problems, Mr. Huntington has worked good jobs for significant periods of time as an adult. He is not afraid of hard, honest work. In Mr. Huntington, we have an individual plagued by physical and mental health issues, cycling through drug use and abuse, and someone who has as a consequence been in and out of the criminal system for quite some time. Nonetheless, he's still an individual worth saving and an extended prison sentence will only be pure punishment and reduce his chances for success.

**<u>Hard Time Variance</u>**

Mr. Huntington also respectfully asks the Court to vary downward because of the extraordinary punishment of having been housed in Sherburne County Jail. Sherburne County Jail is spartan under the best of conditions. There is limited programming, and no opportunity to go outside. People housed in Sherburne County Jail never see the sun, but they do see the lights in their cells, 24 hours a day. Added to the constant noise of people yelling, singing, and crying, it makes sleep almost impossible.

This past year has been even worse. Mr. Huntington's time has fallen during the whole of the pandemic. Due to Covid restrictions, people can't even participate in the limited programming the jail offers. The only exercise they can get is what they can do in their cell. For weeks at a time, people have been kept in their cells 22 hours per day, with just two hours out to use the day room. The conditions are damaging, physically and psychologically. The hard time Mr. Huntington has spent in custody has been extraordinarily punitive, and he respectfully asks the Court to take these conditions into account in sentencing.

## **CONCLUSION**

For all of these reasons, Mr. Huntington respectfully asks the Court to give him the lowest possible sentence available. If the Court should determine that he is an armed career criminal, 180 months is more than sufficient to accomplish the needs of 18 U.S.C. § 3553. If the Court determines that he does not qualify for ACCA status, then a sentence at the bottom of the guideline range would be appropriate.


Dated:  October 5, 2021                                      Respectfully submitted,

                                                      **LAW OFFICES OF**
                                                      **THOMAS H. SHIAH, LTD.**

                                                      By     S/Thomas H. Shiah
                                                             Thomas H. Shiah #100365
                                                              331 Second Ave South, Ste 705
                                                              Minneapolis, MN 55401
                                                              (612) 338-0066

                                                              Attorney for Defendant